Fuchsberg, J.
These two article 78 proceedings are very close on their facts and raise the same legal questions. In each the petitioner is an owner of real property in the City of New York who seeks to alter and convert it for use as a domiciliary care facility for adults pursuant to the New York State Hospital Code. Both applied for and were granted building permits from the city for the necessary alterations. After each had expended or undertaken large obligations for the necessary work so authorized, the permits were suspended by the city’s Department of Buildings’ Borough Superintendent, presumably on the basis of the adoption by the city’s Board of Estimate of a so-called "stop-gap” resolution which directed the suspension of all such permits. The "stop-gap” resolution was the one later to be ruled invalid in Matter of Temkin v Karagheuzoif (34 NY2d 324).
In the Bayswater case, Special Term’s judgment directed the reinstatement of the building permit nunc pro tunc and granted petitioner 28 days of construction time in which to vest its rights, that period being arrived at on the basis of the time elapsed between the date of revocation and the date of a later valid (not the "stop-gap”) resolution controlling construction of health-related facilities. The judgment was unanimously affirmed by order of the Appellate Division, Second Judicial Department (45 AD2d 955).
In the Lee case, after Special Term had dismissed the petition on its merits, the Appellate Division, First Judicial Department (45 AD2d 836), unanimously reversed and ordered the entry of judgment reinstating the permit "for a period of time equal to that during which [it] was unlawfully revoked” "in order that they may complete such construction as may be necessary to satisfy the zoning ordinance of New York City as it existed immediately prior” to the enactment of the valid resolution.
The city now appeals from both orders. Lee cross-appeals because the Appellate Division did not order the immediate vesting of its rights. For the reasons which follow, we believe the order óf each Appellate Division should be affirmed. As to the cross appeal, since the Appellate Division granted Lee the *413 full relief sought in his petition, he is not a party aggrieved and may not appeal (CPLR 5511).
The zoning uses for which the permits were granted were for "health related facilities as defined in the New York State Hospital Code, and domiciliary care facilities for adults under the jurisdiction of the New York State Board of Social Welfare each of which have secured certification by the appropriate governmental agency”. (New York City Zoning Resolution, § 22-13, as amd March 8,1973.) Bayswater’s permit was issued on November 7, 1973, Lee’s on November 20, 1973. At the time each was issued, and earlier when it had been applied for, the city knew that certifications by "the appropriate [State] agency” (the State Department of Health in Bayswater; the State Board of Social Welfare in Lee) had not yet been secured. However, in Bayswater’s case, written approval was in fact granted formally by the State on November 29, 1973, the very date the city permit was revoked, and in Lee’s case written State approval was transmitted on March 8, 1974, a date before this proceeding was heard at Special Term. A number of factors give strong support to our view that failure to receive prior certification was a mere irregularity subsequently cured as to each of these permitees.*
Initially it is clear from its legislative history that the reference to certification in the amendment to section 22-13 was not of great moment. It was entirely absent from the City Planning Commission’s report on legislative purpose which accompanied its enactment. The stated purpose was to more precisely distinguish among health care facilities, domiciliary care facilities for adults, and nursing homes, all of which had previously been lumped together as uses permitted "as of right” in residential areas. The incorporation of the language referring to State certification appears to have been purely incidental to draftsmanship.
This also accords with Zoning Resolution 22-13’s practical construction by those charged with its enforcement, both before and after the amendment. And, consistently with the uniform practice of his department, the city’s Superintendent of Buildings in charge of Queens, the borough where the Lee facility was to be located, on August 23, 1973 expressly *414 advised Lee that no other governmental approval was required as a condition precedent to obtaining a valid city permit. Petitioners’ reliance on that official assurance, and on the practice which it accurately described, accorded with the principle that "the use of contemporary and practical interpretation makes for certainty in the law and justifies reliance upon the conduct of public officials”. (2A Sutherland, Statutes and Statutory Construction [Sands 4th ed], § 49.03, p 233; see McKinney’s Cons Laws of NY, Book 1, Statutes, § 128, p 265.)
Indeed, though it is unnecessary for us to reach that question here, the practicalities hardly leave us free from doubt whether it would be correct to construe the State certification phrase as a condition precedent altogether. This is especially so since zoning ordinances, being in derogation of common-law rights, are to be read narrowly and their ambiguities resolved in favor of property owners. (Matter of Glenel Realty Corp. v Worthington, 4 AD2d 702; cf. People v Ryan, 274 NY 149; Matter of H. P. V. T. Corp. v McGuire, 58 Misc 2d 159.)
The State certification was for the use rather than the construction of the facility. Permission for the latter would not necessarily mandate the former. Normally a building permit precedes the start of an alteration; the issuance of a local certificate of occupancy, attesting to its satisfactory completion, would ordinarily come after the work was done. Only then would the health care facility be in condition to meet the requirements for State certification. Also, a builder who applied for an alteration permit did not necessarily have to be the operator of the contemplated domiciliary facility. So it was possible, in fact made sense, for a builder to withhold closing his contemplated purchase of the property and the leasing thereof to a contemplated operator until a permit had issued. That is not hypothetical; it is what Lee actually did without any State problem. The proposed operator, not the owner, would then be the one to file an application with the appropriate agency for the State certification. Under these circumstances, it is not surprising that in actual practice the expected order of things had been to obtain a building permit first and State certification thereafter.
A close reading of the statutes and rules regulating the State board supports the pragmatism of such an order of things. In order to obtain final written approval of the State board, an operator must demonstrate "that the buildings * * * comply with applicable law and rules of the board” *415 (Executive Law, § 758, subd 3, par [c]). An application and a set of architectural plans must be submitted to the board, which then commences a review thereof, applying the standards set forth in section 758 of the Executive Law, and Parts 20 and 21 of title 18 of the Official Compilation of Codes, Rules and Regulations of the State of New York. Part 20 of the board’s regulations requires that all domiciliary care facilities contain certain safety features, including automatic smoke detection equipment on each floor and adequate numbers of fire extinguishers, nightlights and handrails in the hallways. (18 NYCRR 20.2 [b].) Part 21 requires certain comfort features, such as adequate lighting, ventilation, toilet facilities, heating capacity and dining facilities. (18 NYCRR 21.5.) All these must be satisfactory before certification, except that, in the case of facilities in the City of New York, the city’s Building Department’s approval of their satisfactory installation (pursuant to local permit) is substituted as the basis for State board certification. That is pursuant to section 20.2 (c), which provides that all domiciliary care facilities are to be constructed in conformity with the State Building Construction Code, save for those in New York City, which are to conform to the New York City Building Code (Local Laws, 1968, No. 76).
Further, petitioners here alleged, and respondents did not deny, that the city’s belated emphasis on State certification was not because it was concerned about the existing practice. Instead, it was a response to political pressure by neighborhood groups who wished the zoning law changed. But that required approval by the City Planning Commission before it could be acted on by the Board of Estimate, a procedure taking more time than the impatience of the sponsors of the proposed change would countenance. The result was resort to the unlawful "stop-gap” resolution adopted posthaste on December 6.
Significantly, even that abortive resolution made no reference to any problem over lack of State certification and it was equally and completely absent from the letter transmitting it for enforcement from the Deputy Mayor of the city to the building commissioner as well. It was the latter, going beyond both the "stop-gap” resolution and the mayoralty transmittal, who, in his enforcing zeal, first resurrected the certification language, which up to then had been treated as dead-letter words. At one fell swoop he applied it indiscriminately to all *416 the approximately 50 permits for such projects which were then in force, making no distinction between those who, in good faith, had made considerable progress in the work authorized by their permits and those who had not. In doing so, he went far beyond the invalid resolution he was purporting to enforce, since it only applied to those where substantial work progress had not taken place, a condition which, if not enlarged upon by the commissioner, would not have required the revocation of the two permits here at all.
Unfortunately, by then, each petitioner, neither of whom had any reasons to expect its permit to be revoked or suspended, was well underway in the work it undertook pursuant to its permit. When the Lee project was halted in its tracks by the revocation, its main building had already been gutted, its roof and sidewalks opened and exposed to the elements and, according to its submission, various obligations undertaken to the tune of at least a million dollars. It had also closed title to and leased the premises involved immediately after the permit was granted. Much of this being easily verifiable, since the work was literally exposed to view and a matter of public record, it is significant that its extensiveness is not seriously denied by the respondents. In Bayswater’s case, there are similar claims of amounts expended or obligations incurred totaling about $590,000.
So far as appears from the record, these petitioners have been faultless in their relationship with the city, whether in this transaction or otherwise. Their applications appear to have been completely truthful. We, therefore, consider it irrelevant to concern ourselves here with the transgressions of others, whether in or out of government. It certainly should not prejudice those whose hands are clean and whose conduct is above reproach. No representative of the city, at any level, has, in the course of these litigations, even hinted that those are not the cases here. Accordingly, as in Matter of Temkin v Karagheuzoff (34 NY2d 324, supra), each of the unanimous Appellate Divisions was justified in finding that respondents were estopped from barring each of these petitioners from the opportunity to complete the vesting of its respective right to complete construction. Though Temkin did not involve a State certification question, its opinion is equally applicable here when it states (p 329) "the work had been commenced not only with the approval, but with the actual permission of the *417 respondents. As a result of such permission and approval, petitioners had changed their position to their detriment”.
Accordingly, the orders appealed from should be affirmed and the cross appeal dismissed.

 Compliance with technical or procedural matters may be regarded as a curable irregularity (see Schultze v Wilson, 54 NJ Super 309; Gordon v Board of Appeals of City of Schenectady, 131 Misc 346; 1 Anderson, New York Zoning Law and Practice [2d ed], § 6.10; cf. Soviero v Amato, 71 NYS2d 101).