OPINION OF THE COURT
Robert J. Stolarik, J.
This is an action on a counterclaim. The first counterclaim seeks a judgment directing plaintiff, Town of Orangetown (hereinafter Town), to reinstate a building permit. The second counterclaim seeks damages against the Town for civil rights violations, in violation of 42 USC § 1983. The trial is bifurcated. The liability phase of the action has been completed and this decision will address only the issues of liability.
FACTS
In 1979, defendants (hereinafter Bradley) began planning for a 184,000 square foot industrial building which was to cover approximately four acres and cost approximately $3,000,000 to construct. Plans were prepared in consultation with the then Building Inspector. (There was no requirement to make application to the Planning Board under the building regulations in effect at the time.) Bradley submitted a site plan (which contained plans for sanitary sewers, storm sewers, a drainage plan, access roads, parking, and building elevations), a general development plan and plans for the footings, framing layout, roof and outside veneer. The plans included provision for a railroad spur. The plans did not show the proposals for mechanical equipment, electrical equipment and other interior plans, which would be dictated by the needs of future tenants. It was contemplated that additional plans would be submitted as the project progressed and the permit could be extended appropriately. The plan called for a single building (hereinafter Building 15) on a single lot of approximately 34 acres. Prior to issuance of a building permit, Bradley was required to purchase additional acreage to satisfy *883 the Town requirements for access to a public road. Bradley fulfilled this requirement by purchasing 13 acres at a cost of $123,000. The building permit for Building 15 was issued on April 7, 1980, and was restricted to "land clearing, footings and foundations”.
Subsequent to the issuance of the building permit, Bradley commenced to develop the site. The plan called for the excavation of approximately 800,000 square yards of fill, encompassing approximately 20 acres, to bring the site down to the elevations provided for in the plans, and for which the permit issued. Bradley bid successfully to sell some of his fill to the Town (approximately 300,000 square yards), used some in the development of other sites being developed by them, donated some fill to a local college and also provided fill for the improvement of a Town road (at no cost to the Town). With the beginning of the site development, there were complaints from other residents in the area. There was a complaint regarding smoke from the burning of trees that were being taken down (Bradley had obtained a burn permit), and complaints that the trucks carrying the fill were causing problems on Western Highway. It should be noted that these were Town trucks, but in response to these complaints, the then Supervisor contacted Bradley and prevailed upon them to find a new route. Bradley negotiated with Conrail to use their railroad crossing as part of an alternate route and, over the course of the next year, Bradley was required to pay approximately $70,000 to flagmen manning the crossing. Over the course of many months following, Bradley and the Town were involved with the further development of the railroad crossing, working with the Department of Transportation and Conrail officials. After approval was obtained to install protective devices, Bradley sent a truck to the midwest to pick up the components of a control station (gates and flashers). Bradley was required to pay $68,000 for the control devices, none of which was reimbursed by the Town. Their total involvement in the development of the railroad crossing cost Bradley approximately $250,000.
Bradley also became involved with the Spring Valley Water Company regarding the plan for drainage around Building 15. This plan required placing water and sewer lines under the railroad tracks, and a new plan was submitted and approved in 1982 to accomplish this end. The work under the Conrail tracks required the services of a jacking company and periodic inspections by Conrail, the cost of which was borne by Bradley *884 in an amount in excess of $100,000. Town approval was also required for this development. They also were engaged in negotiations with the Spring Valley Water Company regarding an easement owned by the Water Company through that part of Bradley’s property that was being excavated. The Water Company had a large pipe running through that area which, after the site was brought down to grade level, would be several feet above the ground. Securing the necessary permits from the Water Company to relocate the pipeline apparently was a monumental endeavor and made more difficult by the Water Company’s insistence that Bradley give up their rights to the self-contained water system within the Bradley industrial complex. The value of this system was estimated by Bradley to be in excess of $1,000,000, and was an asset they did not want to give up without considerable negotiations and careful consideration, in spite of the fact that the location of Building 15 was dictated by the configuration of the land, the size and design of the building and the necessity for railroad accessibility. These negotiations continued until March 5, 1985 when an agreement was finally concluded between the parties. Bradley agreed to turn over their private water system to the Water Company.
During these years also, a group calling themselves BAR (Blauvelt Area Residents) became interested in Bradley’s activities. BAR was a citizens group which apparently monitored the political goings-on in the community with particular interest in building operations in the area of their constituency. One of the leaders of the BAR group was Bradley’s former attorney, who claimed to have no personal feelings about Bradley, but who did allow that their association was ended by a fee dispute. As early as 1982, the BAR group started to make Bradley the object of very close scrutiny. They appeared at meetings whenever a Bradley application/petition was presented and, in 1983, appeared at one meeting in such large (and vociferous) numbers, that the Town police were summoned to restore order and move the meeting to another room. The then Supervisor of the Town was a member of the BAR group, as was his wife, but it is interesting to note that Bradley’s former attorney denied any knowledge of that, and his wife (also a witness in the case) testified that she never discussed the Bradley case with the then Supervisor outside of official meetings. The court finds this incredible.
Periodic complaints were made by the BAR group about the Bradley activities: The discovery of some empty drums and old *885 furniture on the site, parts of felled trees encroaching on neighboring property, and the location of a temporary storage building on the site which became the main target of the BAR group’s activities. Bradley had received a building permit for the building, but it was the BAR group’s contention that there was no provision in the Town’s building regulations which would permit a temporary building. While all of these complaints seemed to be legitimate, this constant surveillance of Bradley, and the continuing pressure put on the Town officialdom, gives the court the distinct impression that the BAR group would oppose any further development of the Bradley Industrial Park. (Indeed the former Town Attorney testified that the BAR group was opposed to anything Bradley might want to do with their property.) Their members, given access to the Town files, attended Town meetings that concerned Bradley and at one point even demanded an investigation of the building office. The court notes, however, that even though there might have been some legitimate complaints concerning the Bradley activities, the court must focus on the primary issue in this case, i.e., was the action taken by the Building Inspector in revoking the Bradley’s building permit illegal and improper.
The building permit was renewed in April 1983, work continued and by 1985, the extensive site preparations for Building 15 were almost completed, and all of the other projects involving Conrail, the Town and the Spring Valley Water Company were either completed or near completion. (In this regard, the court finds that all of these "off-site” improvements which were necessary for the eventual construction of Building 15, necessarily took a great deal of time, and accordingly finds no "abandonment” of the project.) Actual construction of the building had not begun as yet, but the preparation of the site, and the completion of those other requirements, brought Bradley to the point where they were ready to commence work on the footings. Political and community activity appeared to pick up about this time also. Complaints were made about the Bradley’s tree cutting activities relative to the internal road network involving Building 15. Not only were there complaints that felled trees were encroaching on neighboring properties, but there were some questions also being raised about whether or not Bradley had a right to proceed with the road construction. During the early part of 1985, the Bradley building permit for Building 15 was also extended for a six-month period. (Mar. 8, 1985-Oct. 18,1985.)
*886 On June 13, 1985, there was a meeting of certain Town officials including the Building Inspector, the Supervisor, some members of the Town Council and possibly others. There are no minutes of this meeting extant and, not surprisingly, the recollections of the witnesses are rather vague. But the Building Inspector did make notes which have been received in evidence, and which represent the only written record of the meeting. (It should be noted that Bradley was not notified of the meeting.) This meeting resulted in the Building Inspector going to the site the next day and issuing a violation with regard to the temporary storage building. Bradley met with the Building Inspector to discuss a timetable for the removal of the temporary building. On July 10, 1985, the Building Inspector was again on the site. Trees were being cut and the Building Inspector did not tell Bradley to stop, nor did he suggest they had no permission to proceed with the road. His only admonition was that they should take care that the trees were not dropped on the neighboring properties.
On July 18, 1985, the Bradley’s contract with the Town for fill expired. Bid documents were sent out for a new contract, but Bradley decided not to bid in that they were down to grade level with their excavations, and were ready to proceed with the construction of the footings. Some holes were actually dug and reinforcing steel rods were brought to the site.
On July 19, 1985, Bradley was served with a summons and complaint for alleged criminal acts in failing to comply with a stop work order. The testimony revealed that at the time of the service of the criminal summons, the stop work order had yet to be served. (The stop work order was not served on the defendants until July 22, 1985.) The then Town Attorney and the Building Inspector could not explain this obvious gaffe. Indeed, the then Town Attorney could not recall why his office issued the criminal summons ("They had a permit”), and doesn’t recall the circumstances under which the stop work order issued, but he testified that no "pressure” was brought on his office to issue the order. He could not recall anything specific about the work site, but vaguely recalls that the stop work order had to do with "illegal activities”. (The court notes also that the criminal charges were never pursued and were eventually dismissed in 1988.) The stop work order was directed to the road construction, which defense witnesses testified was in fact authorized by decision PB No. 2-89, dated January 13, 1982.
On July 19, 1985, the Town Clerk sent out notices for a *887 special meeting of the Town Council to be held on July 22, 1985. The meeting was not to be held at the Town Hall but on Avis Court, which thoroughfare was near the Bradley property and where some of the BAR members resided. Obviously, the residents of that community requested that the meeting be held at that site. There was no specific testimony in this regard (nor any recollection thereof), but reason compels the conclusion that the Town Board did not appear uninvited at the Avis Court location. (Again, Bradley was not notified of the meeting.) The meeting was attended by the Supervisor, the Town Council, the Building Inspector, the then Town Attorney, some other Town officials and many area residents. The testimony concerning the conduct of the meeting was vague, but apparently, there were some raised voices and some angry citizens. The minutes of the meeting were somewhat abbreviated but did reveal that "this special emergency meeting” was held "to review activities and the concerns of residents in the area of Bradley Industrial Park”. A resolution was adopted directing the Building Inspector to investigate "whether or not plans have been filed and approved for the work being currently done at Bradley Industrial Park, for the land cleaning, building of a road and for three future buildings.” (The court notes that there was sufficient officialdom at the meeting including the Building Inspector, Planning Board members, etc., who could have clarified all of these questions.) The resolution went on to require that "this information and official maps shall be presented to the Board by Monday, July 29, 1985”.
There was some conflicting testimony regarding the circumstances of the resolution (some witnesses have no recall of a resolution being passed). There was also some conflicting testimony regarding the Supervisor’s direction to the Building Inspector at the meeting to shut Bradley down. Predictably, certain witnesses had no recollection of such a directive. (The then Supervisor, the Building Inspector and the then Town Attorney.) Indeed, the testimony of the then Town Supervisor throughout the trial was characterized by an incredible lack of detail. In response to most questions, the response was that he did not "recall”. It is incredible to the court that the then Supervisor could not recall, even generally, the public clamor that was attendant to the construction on the Bradley premises. He barely acknowledged the identity of Bradley, the Magees and their building operation. But a member of the Town Council and the Director of Public Works did recall *888 such a statement. The court chooses to accept the latter testimony, both on credibility and motivational grounds and, also, by reason of the subsequent events. The July 29, 1985 deadline for the submission of the information to the Board was never met. The building permit was revoked prior to that time. The court also notes that there seemed to be little or no purpose for the resolution. It would appear that the Building Inspector (amongst others) knew of the existence of approved plans and permits for the building issued, the roads, land clearing and three other buildings.
It should be noted that Bradley met with the Building Inspector earlier that day. One of the partners of the Bradley complex, Patrick Magee, brought with him drawings and other documentation relative to the road in question. (The court has previously noted that the stop work order, which was dated July 19, 1985, was not delivered to Bradley until July 22, 1985. However, the criminal summons and complaint was served on Bradley on July 19, 1985, for noncompliance with the stop work order.) The stop work order directed that "all clearing and grading shall cease pending an interpretation and/or clarification of the scope of the construction of the 'roadways’ in Decision PB #82-9 of January 13, 1982”. The Orangetown Zoning Code requires that all stop work orders "shall state the conditions under which the work may be resumed”. Mr. Zimmerman admitted that the July 19, 1985 stop work order failed to comply with this provision of the Code since no such "conditions” were stated under which work could be resumed. PB No. 82-9 reads in pertinent part as follows: "The decision of this Board is that the applicant is to proceed [sic] and he, the applicant, has permission to construct the necessary roadways as shown on said map.” Thus the Building Inspector knew Bradley had a building permit and he knew they had permission to proceed with the road. (The court rejects the testimony of another witness and the Building Inspector’s testimony on trial that PB No. 82-9 only meant Bradley could proceed with the "planning” of the road. The court also notes that the Building Inspector, in his examination before trial, acknowledged that Bradley had permission to proceed with the construction of the road.) The Building Inspector also testified on trial that Bradley had no "permit” to proceed with the road. A "road” permit? Nowhere in the record is there any testimony/documentation that there is such a requirement in the Town of Orangetown. It is clear to the court that Bradley had every right as of July 19, 1985 *889 to proceed with the construction of the road and that there was no basis for the issuance of the stop work order. It should have been equally clear to the Building Inspector on July 22, 1985 when he was confronted by Patrick Magee, that Bradley had every right to proceed and that the stop work order should not have been issued. And why the sudden change of attitude with regard to the road construction? The Building Inspector had been there just a few days before and had not expressed any concern that there was any impropriety. In any event, he told Patrick Magee that he should call him the next day and that he could probably proceed with the road construction. (The Building Inspector claims he has no recollection of this conversation.) Attempts to call the Building Inspector the next day and for the next few days were fruitless and he never called back. It is also noted that the Building Inspector never mentioned to Patrick Magee the meeting which was to be held on Avis Court that evening.
On July 25, 1985, the Building Inspector wrote a letter to the then Supervisor in which he acknowledged the issuance of a building permit for Building 15, but further stated that, "Based on the discrepancies between the present documents for this development and those upon which the two building permits were issued (road layout, site layout, building layout, etc.), the six month extension of Permit #18922 is rescinded and the permit has expired.” In this letter he also advised the then Supervisor that "no further operations can be conducted in this area without filing the necessary documents to appear before and receive the approval of the appropriate Boards.” This letter was hand delivered to the then Supervisor, and a copy sent "certified mail” to Bradley. This unusual procedure of addressing the revocation to the Supervisor and not to the permit holder leads the court to the reasonable conclusion that the Building Inspector was responding directly to the Supervisor’s directive/request to revoke the permit.
The avowed reason for the revocation of the building permit, i.e., "discrepancies” has no basis in fact. There is nothing in the record to indicate that there were any deviations from the approved plans and what was done on the ground. Indeed, the Building Inspector acknowledged that he took no measurements or otherwise determined that there were such deviations. Instead he offered, on trial, the explanation that there was no building on the site, and that it didn’t look like a building site. (He also described the construction site as the "Dakota Badlands”.) He additionally indicated that the permit *890 was revoked, "Just to expedite it and get rid of it, get it out of my hair”. The court is constrained to conclude that the latter was his real motivation in revoking the permit, and that this attitude reflected the attitude of the then Supervisor and others in the Town government at the time. The court notes also that there was no provision in the Town building regulations at the time for the revocation of a building permit. The Building Inspector has no recollection of speaking to Patrick Magee at a Planning Board meeting of July 25, 1985 (in spite of the fact that he was confronted by an angry Patrick Magee), has no recollection of telling Magee that the permit was revoked, and has no recollection of telling Magee not to go to the Zoning Board of Appeals (which would have had the effect of "staying” the revocation). He did state, however, that he did not tell Magee what to do to have the permit reinstated. He "assumed” that Magee knew what to do.
On the basis of the record herein, the court concludes that there was no legal basis for the revocation of the building permit. It is clear that the Town succumbed to public pressure to shut Bradley down, and that several Town officials (the Building Inspector, the then Town Supervisor, the then Town Attorney and certain members of the Town Board) participated to accomplish this end.
VESTED RIGHTS
The defendants’ first counterclaim seeks an order of this court directing the Building Inspector to reinstate the building permit to permit the construction of Building 15. To be successful on this cause of action, defendants are required to prove the existence of a "vested” right in the building permit. More particularly, they are required to prove that (1) the revoked building permit was legally issued in compliance with all of the provisions of the Town Zoning Ordinance, (2) that they had made substantial improvements and incurred substantial expenses in reliance on the issued permit, and (3) that the permit was illegally revoked.
LEGALLY ISSUED PERMIT
Plaintiff has never contended that the building permit was illegally issued and the court finds as a fact that the initial building permit and its subsequent extensions were in compliance with all provisions of the Orangetown Zoning Code.
*891 SUBSTANTIAL IMPROVEMENTS/SUBSTANTIAL EXPENSES INCURRED BY BRADLEY IN RELIANCE ON THE PERMIT
The vested rights theory is court-made law which is utilized to permit developers to complete structures/projects which have been halted either by illegal actions of a municipality and/or as a result of community/political pressures. If illegal actions are found to have occurred, the developer is deemed by law to have acquired "vested” rights to complete the project as it was initially approved. The "vested” rights theory, in fact, returns the developer to that point in time where the illegal action occurred and permits the developer to complete the project under the law as it existed at that time. (The Orangetown Zoning Code has since been amended to preclude the construction of Building 15.)
In its findings of fact, the court has referred to numerous improvements made and monies expended on the subject property in reliance upon the building permit. Defendants’ testimony that almost $4,000,000 was spent on preparation of the land, roadways and footings prior to the revocation of the permit is uncontroverted. In Matter of Temkin v Karagheuzoff (34 NY2d 324), a vested right was found to exist where $700,000 in expenditures had been incurred by the developer. (See also, Matter of Faymor Dev. Co. v Board of Stds. & Appeals, 45 NY2d 560 [vested rights were found where substantial expenses had been incurred, the building permit had been illegally revoked and neighborhood protesters had prevented construction work]; Matter of Bayswater Health Related Facility v Karagheuzoff, 37 NY2d 408 [vested rights existed where $590,000 had been expended in reliance on the permit which had been illegally revoked in direct response to political pressure by neighborhood groups].) Accordingly, this court finds that defendants made substantial improvements to the property and incurred substantial expenses, in excess of $4,000,000, in reliance on their permit.
ILLEGAL PERMIT REVOCATION
If plaintiff had the legal right to revoke the defendants’ building permit, there would be no substance to this action. At various junctures in this lawsuit, the Town has proffered different reasons for revoking the defendants’ building permit. The court will discuss each of these.

*892
"Dakota Badlands”

Mr. Zimmerman, the Town Building Inspector, alleged that upon inspecting the construction site in July of 1985, it did not look like a construction site but rather resembled the "Dakota Badlands”. Neither of these reasons provide a legal basis for revoking the building permit. Pursuant to the terms of the building permit, defendants were authorized to remove 800,000 square yards of dirt to bring the site to the appropriate grade. The removal of such massive amounts of dirt would obviously present an unsightly appearance. However, the removal of dirt was done pursuant to the provisions of the permit and with full knowledge of the Town officials who actually purchased 300,000 square yards of fill for use at the Clarkstown landfill.

Discrepancy Between Filed Plans

The Town has actually presented two separate discrepancy arguments to this court during the course of this litigation.
(A) At one juncture, the Town contended that the actual excavation/site preparation work did not comply with the conditions upon which the original permit was issued, that Bradley was not following the approved plans. They also contended that the road clearing operations were in violation of PB No. 2-89. Eventually, at trial, it was admitted by the Building Inspector that the site conditions on the date he revoked the permit were in full compliance with the original plans and permit which had been issued by the Town. In addition, the Building Inspector reluctantly admitted that defendant had the right under PB No. 2-89 to construct the roads which were in existence on the date the permit was revoked.
(B) At another juncture, the Town argued that the building permit was revoked because Bradley had subsequently filed plans which differed slightly from the plans on which the building permit had been issued. However, at trial, the Town’s witnesses agreed that the subsequent filing of different plans did not affect Bradley’s right to continued construction work under the original plans. There is no provision of State law or the Town Code which would operate to deprive the defendants of their rights in the original permit based upon the filing of subsequent plans.
In essence, the Town attempted throughout the trial to *893 provide the court with some legal basis for the revocation of the building permit. None was ever provided.
Perhaps the most truthful testimony adduced from the Building Inspector was the statement he made in reference to the revocation of the building permit, "get rid of it” — "get it OUT OF MY HAIR”.
From the record herein, the court is constrained to conclude that it was the community protesters (the BAR group) and the Town officials that Mr. Zimmerman was "getting rid of’ and "getting out of his hair”.
The court therefore finds that defendants have sustained their burden of proving that the building permit was legally issued, that defendants made substantial improvements and expended significant sums of money in reliance on the permit and that the permit was illegally revoked. Defendants have therefore clearly established the existence of a "vested right” to construct Building 15. Otherwise stated, defendants have proven the substantive elements to establish the existence of a "vested right”.
The defendants are directed to join the Building Inspector as a party to this action prior to the damages portion of the trial herein. (D.B.C.G., Inc. v Town of Ramapo, 97 AD2d 533; CPLR 1001 [a], [b].)
42 USC § 1983/SUBSTANTIVE DUE PROCESS VIOLATION
To sustain a claim for a civil rights violation under 42 USC § 1983, the plaintiff must prove the following: (1) A deprivation of a right, privilege, or immunity secured by the United States Constitution, (2) to which it was subjected or caused to be subjected by a person acting under color of State law.
The Town concedes that the Orangetown officials herein were acting under color of State law.
Bradley claims that the Town of Orangetown, through the actions of its officials, deprived them of a "property right” which it had in the permit for Building 15 and therefore violated Bradley’s rights under the United States Constitution. More specifically, Bradley claims that Orangetown officials deprived Bradley of its right to "substantive due process of law” by illegally and unlawfully revoking the building permit.
The court must first determine whether the defendant Bradley possessed a "property interest” in the permit for Building 15.
*894 "The hallmark of property, the [United States Supreme] Court has emphasized, is an individual entitlement grounded in state law, which cannot be removed except 'for cause.’ Memphis Light, Gas & Water Div. v. Craft, 436 U.S. 1, 11-12 (1978); Goss v. Lopez, 419 U.S. 565, 573-574 (1975); Board of Regents v. Roth, 408 U.S. 564, 576-578 (1972).” (Logan v Zimmerman Brush Co., 455 US 422, 430.) Furthermore, " '[property interests * * * are not created by the Constitution’. To determine whether a property interest in some benefit rises to the level of a right protectible under the fourteenth amendment, courts therefore must look to 'existing rules or understandings that stem from an independent source such as state law — rules or understandings that secure certain benefits and that support claims of entitlement to those benefits.’ 408 U.S. at 577, 92 S.Ct. at 2709” (Brady v Town of Colchester, 863 F2d 205 [2d Cir 1988]).
As previously discussed, under New York State law, Bradley had acquired a "vested right” in its building permit to construct the 184,000 square foot building on lot 15. This "vested right” constitutes a "property interest” which is subject to protection under the Fourteenth Amendment of the United States Constitution.
Having found the existence of a constitutionally protected property interest in the building permit, what are Bradley’s "substantive due process” rights? Succinctly stated "substantive due process” assured Bradley as a permit holder of the right to be free from arbitrary or irrational actions by the Town of Orangetown. (Arlington Hgts. v Metropolitan Hous. Corp., 429 US 252, 264, 267.) Since the Orangetown Building Inspector had no legal basis to revoke the building permit under State law, there was no rational basis for the Town’s actions and the defendants’ right to substantive due process of law was violated. (Brady v Town of Colchester, supra, at 215-216.) As noted in the Brady decision, not every incorrect decision by a local official provides a valid claim for constitutional deprivation. No constitutional violation arises when a Town official makes a wrong "judgment call”. Otherwise stated, there is no constitutional violation where a public official makes a good-faith mistake or an incorrect decision regarding the applicable law. No such "good-faith” error was made by Orangetown officials in revoking Bradley’s building permit. Rather, the evidence adduced at trial proved that a concerted, orchestrated effort was made by the Town Supervisor, some of the members of the Town Board, the Town *895 Attorney and the Building Inspector to revoke Bradley’s building permit to satisfy the political pressures that were being exerted by the BAR group. The decision to revoke the building permit was made with total disregard for the provisions of applicable law. (Faymor Dev. Co. v Board of Stds. & Appeals, supra, at 566; Bayswater Health Related Facility v Karagheuzoff, supra, at 415.)
The instant case presents a factual scenario similar to that in Sullivan v Town of Salem (805 F2d 81 [2d Cir 1986]) where a municipality was alleged to have violated a developer’s Fourteenth Amendment rights by refusing to issue certificates of occupancy for houses which fully complied with all State and municipal laws, zoning rules and regulations and codes. The Second Circuit emphasized that there was no discretion to be exercised by the building officials who were required under State law to issue the certificates of occupancy. In Sullivan, the municipality alleged that its reason for not issuing certificates was that the development roads had not been dedicated. However, if dedication was not a lawful requirement for the issuance of a certificate under either Connecticut State law or local municipal law, the municipality would have had no discretion to deny issuance of the certificate. The Federal Circuit Court found that such action, if proven, was sufficient to state a cause of action against the municipality for violation of the developer’s rights under the Fourteenth Amendment and 42 USC § 1983.
Likewise, in the instant case, the reasons asserted by the municipality for revoking the permit (the "Dakota Badlands” characterization, the alleged "discrepancy” between the construction work and the filed plans) do not provide a legal basis for the revocation of the defendants’ building permit.
Otherwise stated, the Building Inspector and those government officials who pressured him to revoke defendants’ building permit were not choosing between legal courses of action and exercising their discretion. They simply responded to the community pressures and revoked the defendants’ building permit without any legal basis for their action.
DEFENSE OF IMMUNITY
The defense of "qualified immunity” is not available to Town officials who have been found to have violated defendants’ rights. Since the Orangetown officials and the Building Inspector acted in an arbitrary and capricious manner in *896 violation of established law and procedures, the "qualified immunity” defense is without basis in law.
RESPONDEAT SUPERIOR
A municipality may be sued under section 1983 but such liability cannot be based upon "respondeat superior”, attributing the acts of government officials/employees to the municipality for the purpose of imposing liability on the municipality. (Monell v New York City Dept. of Social Servs., 436 US 658, 690.) The municipality is subject to liability for the acts of its officials/employees only if the action that is alleged to be unconstitutional "implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body’s officers”. (Supra, at 690.) Municipalities may also be answerable for "constitutional deprivations visited pursuant to governmental 'custom’ even though such a custom has not received formal approval through the body’s official decisionmaking channel.” (Supra, at 690-691.)
It is also well settled that "municipal liability may be imposed for a single decision by municipal policymakers under appropriate circumstances.” (Pembaur v City of Cincinnati, 475 US 469, 480.)
The Supervisor’s direction to the Building Inspector at the July 22, 1985 meeting to shut Bradley down is sufficient in and of itself to impose liability on the Town of Orangetown. It is clearly within the Supervisor’s authority to establish Town "policy”* and this particular Town policy was without basis in law.
However, numerous other "policy” decisions were made and effectuated by the Town Supervisor, the Town Board, the Town Attorney and the Building Inspector such as the issuance of the illegal stop work order and the commencement of the baseless criminal proceedings. All of these decisions were made for the purpose of stopping construction of Building 15 in violation of Bradley’s Fourteenth Amendment rights. Otherwise stated, these Town officials were "responsible for establishing final government policy respecting” the issuance of the stop work order, the revocation of the building permit and the institution of criminal proceedings. (Pembaur v City of Cincinnati, supra, at 483.) These Town officials had two choices in the matter, one legal, the other illegal. They could follow and *897 comply with established State and local laws as they dealt with the concerns being expressed by the community, or they could take whatever action the community/political pressure dictated, regardless of the provisions of applicable law. Unfortunately, the Town officials decided to pursue the latter choice and consciously chose to issue an illegal stop work order, illegally revoke defendants’ building permit and institute baseless criminal proceedings.
The Town, itself, is therefore liable for damages which result from its actions in implementing these illegal policy decisions in violation of the defendants’ Fourteenth Amendment rights. (42 USC § 1983.)
While the rights of the citizens to petition their government is a fundamental right under the Constitution, Town officials are legally bound to a strict adherence to the existing constitutional and statutory mandates in rendering their decisions and implementing their policies. In this case, the Town simply disregarded the legal requirements to meet the demands of the citizenry: to prevent Bradley from developing its property.
The Clerk of the Court is directed to set this matter down for a trial on the issue of damages.

 "Policy” is defined as a "course of action consciously chosen from among various alternatives”.