OPINION OF THE COURT
Stephen G. Crane, J.
An order staying all proceedings in this action was entered on November 24, 1998, in order to obtain from the court approval of a Master Settlement Agreement (MSA), in accordance with section II (ss) thereof, and of a Smokeless Tobacco Master Settlement Agreement (STMSA) as contemplated by its section II (mm). At the same time the court granted provisional class certification of a class consisting of the State of New York and all of its counties including New York City and Erie County (the counties) with respect to the sixth cause of action of the amended complaint asserting claims under General Business Law § 342-b. The counties were afforded until December 4, 1998 to object to the settlement or to opt out of the class.
*438 A hearing was held on December 9, 1998, at which briefs amicus curiae[1] were to be submitted and responses by the parties were heard. Pending this hearing, the court appointed a Special Master, Richard M. Weinberg, Esq., to evaluate the proposed settlement, except for the class action portion thereof stemming from the sixth cause of action, and to report to the court on or before December 16, 1998, with his recommendations as to whether or not the settlement should be approved. His report was received on December 16, 1998 and filed the next day.
On December 8, 1998, the City of New York, after some appellate skirmishing, submitted objections that became the subject of negotiation between the Attorney-General and the Corporation Counsel of the City of New York. As a consequence, on December 10, 1998 a new notice went out to the members of the class of counties and the City of New York with a new allocation among them. A further hearing was scheduled at the discretion of the court if any objections were received by December 17. Erie and Westchester Counties interposed substantive and procedural objections. The court held a hearing on the following day. After hearing all interested parties and receiving a letter from counsel to the Governor, James McGuire, Esq., objecting to the new allocation, the court accepted the withdrawal of the new allocation and solicited a reinstatement of the first or any other version the parties chose to submit.
The court accepted the original allocation for renewed filing on December 18 and directed notice to the class members to opt out or object by December 22 with a hearing to be held on December 23, 1998.
On December 22, 1998, the City of New York and Counties of Erie and Westchester interposed objections to the allocation to which the City of New York alone previously objected on December 8, 1998.
*439 Scope and Standard of Review
The Ad-Hoc Coalition and the parties agree that the standard of review of this settlement is whether it is fair, reasonable and adequate. (Weinberger v Kendrick, 698 F2d 61 [2d Cir 1982], cert denied sub nom. Lewy v Weinberger, 464 US 818 [1983]; Officers for Justice v Civil Serv. Commn., 688 F2d 615, 625 [9th Cir 1982], cert denied sub nom. Byrd v Civil Serv. Commn., 459 US 1217 [1983]; cf., Rosenfeld v Bear Stearns & Co., 237 AD2d 199 [1st Dept], appeal dismissed 90 NY2d 888 [1997].) Moreover, the case at bar presents the additional circumstance of arm’s length negotiations extending over five months. This factor militates in favor of the settlement as does the involvement — indeed, the personal participation — of the Attorney-General of the State of New York in these negotiations. (In re Union Carbide Corp. Consumer Prods. Bus. Sec. Litig., 718 F Supp 1099, 1103 [SD NY 1989].) While the sponsorship of this settlement by the Attorney-General might not merit review under the arbitrary and capricious standard of CPLR 7803 (3),[2] it does invest the settlement with a presumption of validity. (See, City of New York v Exxon Corp., 697 F Supp 677, 692 [SD NY 1988]; Wellman v Dickinson, 497 F Supp 824, 830 [SD NY 1980], affd 682 F2d 355 [1982], cert denied sub nom. Dickinson v Securities & Exch. Commn., 460 US 1069 [1983].)
The amici curiae seem to misconceive the court’s role in applying the standard of review. They imply that the court can change the terms of the settlement. Many of the anti-smoking and public health goals that they lament the settlement has not achieved, as laudable as they are, cannot be inserted by the court. After all, this is a consent settlement and decree that the parties are presenting, and any change in their terms would permit one or another of the parties to withdraw, to say nothing about what this would do to the approvals already achieved in every other State participating in this settlement.[3] Quite the contrary, the court is confronted with a take-it-or- *440 leave-it proposition. I must decide to approve or reject what the parties have placed before the court.
In applying the standard of fair, adequate and reasonable to the MSA and STMSA, the court must assess the risks in the ongoing litigation or the likelihood of plaintiffs’ ultimate success. Furthermore, the nature of the bargaining, including its good faith, plays not only the role of supporting a presumption in favor of the settlement, it is also an independent factor in deciding its status as fair, adequate and reasonable. The court looks to the degree of support for the settlement from the parties themselves and the judgment of counsel. (Matter of Colt Indus. Shareholder Litig., 155 AD2d 154, 160 [1st Dept 1990], mod on other grounds 77 NY2d 185 [1991].) Finally, in a case such as this, infused with public issues, the court will, as did the Special Master (report, at 20-23), assess the impact of this settlement on the public interest. (United States v Hooker Chem. & Plastics Corp., 607 F Supp 1052 [WD NY], affd 776 F2d 410 [2d Cir 1985].)
Likelihood of Success and Risks of Ongoing Litigation
At the time the MSA and STMSA were reached, the court had before it pending undecided two far-reaching motions. It also decided at least one other motion that related to broad aspects of the fraud claims in the amended complaint. One motion sought dismissal of the amended complaint as barred in whole or in part by the Statute of Limitations. Another attacked the pleading for failure to state a cause of action. In a third motion the court ruled that the plaintiffs did not have the right to assert the work product, attorney-client and deliberative process privileges to blockade disclosure relating to their discovery of the facts on which they base their fraud claims. (State of New York v Philip Morris, Inc., NYLJ, Dec. 10, 1998, at 29, col 1.)
More specifically, and without being exhaustive of the intensely litigated issues in these motions: The court was asked to decide whether the State could assert claims directly for economic injuries flowing from tortious conduct directed at others, namely, the recipients of Medicaid or State employees who contracted tobacco-related illnesses. This issue affected the eleventh through sixteenth causes of action to the extent of common-law claims seeking recovery of Medicaid costs and insurance premiums; and there was precedent elsewhere barring recovery for such remote injuries in State v Philip Morris Inc. (1997 WL 540913 [Md Cir Ct, May 21, 1997, Brown, J.]); City *441 of Birmingham v American Tobacco Co. (10 F Supp 2d 1257 [ND Ala 1998]); State v Philip Morris Inc. (551 NW2d 490, 495 [Minn 1996]); State v American Tobacco Co. (1996 WL 931316 [Wash Super Ct, Nov. 19, 1996, Finkle, J.]); State v R.J. Reynolds Tobacco Co. (No. CL 71048 [D Iowa, Polk County, Aug. 26, 1997]); County of Los Angeles v R.J. Reynolds Tobacco Co. (No. 707651 [Cal Super Ct, San Diego County, Dec. 23, 1997]); State v American Tobacco Co. (No. CL 95-1466 AH [Fla Cir Ct, Sept. 16, 1996]); McGraw v American Tobacco Co. (No. 94-C-1707 [W Va Cir Ct, Feb. 13, 1997]); and Coyne v American Tobacco Co. (No. 1:96 CV 2247 [ND Ohio, Feb. 12, 1998]).
Other serious challenges were raised to the State’s claims for indemnification (on the ground the State breached no duty to Medicaid recipients and insured employees); for restitution (because the State paid Medicaid benefits and increased insurance premiums without a specific intent to recoup these from the tobacco industry); and for public nuisance (because the manufacture and sale of tobacco products are not illegal). The defendants attacked the negligent entrustment theory under Nolechek v Gesuale (46 NY2d 332, 339 [1978]). Highly significant to the State’s quest for reimbursement for Medicaid losses for tobacco-related illnesses was defendants’ argument that subrogation was the exclusive remedy under Social Services Law § 367-a (2) (b). Other courts under similar legislation have so held. (See, e.g., State v R.J. Reynolds Tobacco Co., supra; State v Philip Morris Inc., supra; McGraw v American Tobacco Co., supra.) And, in New York, Matter of Costello v Geiser (85 NY2d 103, 109 [1995]) strongly points in the same direction. (See also, McKinney’s Cons Laws of NY, Book 1, Statutes § 301; Oden v Chemung County Indus. Dev. Agency, 87 NY2d 81, 86 [1995]; Matter of Bayswater Health Related Facility v Karagheuzoff, 37 NY2d 408, 414 [1975].)
Defendants also attacked some claims dealing with failure to advise consumers of the harmful nature of tobacco through advertising, labeling or promotion as preempted by the Federal Cigarette Labeling and Advertising Act (15 USC §§ 1331-1340; see, Cipollone v Liggett Group, 505 US 504 [1992]; Small v Lorillard Tobacco Co., 252 AD2d 1 [1st Dept 1998]). Additional questions were raised concerning the recoverability of the State’s own damages in its claims under Executive Law § 63 (12), General Business Law § 349 (b) and § 350-e and whether under the fifth and sixth causes of action the State has antitrust standing and has suffered an injury of the type the antitrust laws were intended to prevent.
*442 Lest the reader conclude from the magnitude of the foregoing problems that the risk of litigation was grave, there must be added to the assessment the defendants’ motion to dismiss the amended complaint as barred by the Statute of Limitations. The amended complaint alleges the following 16 causes of action: (1) fraud, misrepresentation and illegal conduct under Executive Law § 63 (12); (2) deceptive acts and practices in violation of General Business Law § 349; (3) unlawful marketing and targeting of minors in violation of General Business Law § 349; (4) false advertising in violation of General Business Law § 350; (5) and (6) conspiracy in restraint of trade in violation of the Donnelly Act (General Business Law § 340 et seq.); (7) and (8) violation of the Not-For-Profit Corporation Law by defendant Tobacco Institute, Inc., in its formation and operation; (9) and (10) violation of the N-PCL by defendant The Council For Tobacco Research — U.S.A., Inc., in its formation and operation; (11) indemnity; (12) restitution; (13) public nuisance; (14) negligent entrustment; (15) undertaking of and wilful failure to perform a special duty; and (16) aiding and abetting.
For many of these causes of action there were serious accrual problems under CPLR 213 (8) and 203 (g).[4] Given that the court has already rejected plaintiffs’ assertion of privilege to obstruct disclosure of knowledge of facts on which their fraud claims depend (decision on motion sequence 018 dated Nov. 13, 1998), there was likely to be a time bar of a substantial portion of claims and . a severe limitation of recovery for any continuing fraud-based causes of action. The plaintiffs attempted to avoid this consequence by raising an argument of equitable estoppel. This argument rested, however, on the principal claim of the defendants’ wrongs themselves. This has been found wanting to estop a defendant from asserting the Statute of Limitations. (See, e.g., Hoffman v Hoffman, 162 AD2d 249 [1st Dept 1990].)
Judgment of Counsel
Counsel for both sides submit this settlement as a result of their best judgment in negotiating it. The Special Master’s report states (at 18):
*443 “[Counsels’] submissions to this Court and their statements before this Court clearly indicate that they carefully evaluated the risks of litigation and balanced their decision to accept the settlement in light of those risks and what they had, in fact, achieved in settling this case.
“Significantly, in reading transcripts of other hearings before other State Courts on the proposed settlement, I have noted that the reviewing courts have commended the professionalism and integrity of legal counsel in handling this complex litigation and in offering the proposed settlement to the Court for review. (See Connecticut Hearing Transcript, November 25, 1998, p. 13; Massachusetts Hearing Transcript, December 3, 1998, p. 21.)”
Nature of Bargaining Including Good Faith
Once again the Special Master has cogently addressed this factor. He highlighted the intensity of the litigation and its national scope. New York members labored actively from beginning to end. Indeed, Attorney-General Vacco personally participated in the negotiations. The Special Master also evaluated the bargaining from the standpoint of its results. He wrote (at 19): “The results of the negotiation process, in the face of risky litigation, in many ways, speak for themselves: for example, substantial economic and non-economic benefits to New York State, substantial restraints on tobacco industry advertising and marketing practices consistent with the goals of the Amended Complaint; voluntary waivers of the industry First Amendment rights regarding lobbying; abolition of defendant trade associations, establishment of the National Foundation on smoking and health; and establishment of Attorneys General Enforcement Fund on smoking and health.” Finally, the Special Master appropriately drew a comparison to the failed Juné 20, 1997 proposed national settlement. Absent from the MSA are the industry-friendly provisions of the earlier proposal: protections concerning nongovernmental claims and future class actions; settlement of punitive damages claims; and a cap on annual damages awards.
Protection of the Public Interest
Among the objections of amici curiae is the notion that the MSA and STMSA do not suffice to protect the public interest. In his report, the Special Master found that the MSA and STMSA adequately protect the public interest for three reasons: (1) the economic and noneconomic benefits for New York State *444 are substantial; (2) they are consistent with and advance the objectives of New York public policy as set forth in the amended complaint; and (3) some of these benefits are more extensive than could have been achieved through trial or legislation.
An illuminating test of the soundness of plaintiffs’ recommendation of this settlement from the standpoint of the public interest is the comparison of the prayer for relief in the amended complaint with the provisions of the settlement. The amended complaint seeks declaratory and injunctive relief, compensatory, punitive and treble damages, civil penalties and attorney’s fees. This pleading asks for the dissolution of the tobacco industry’s not-for-profit corporations, Tobacco Institute, Inc. (TI), and The Council for Tobacco Research — U.S.A., Inc. (CTR).[5] Plaintiffs requested, inter alia, that defendants be enjoined:
• To take steps to prevent distribution and sale of tobacco products to minors under age 18;
• To cease targeting minors or inducing them to smoke; To disclose nicotine yields of their products;
• To cease engaging in unlawful and fraudulent practices and unreasonable restraints of trade;
• To disclose and publish all previous research relating to tobacco use and health or relating to nicotine addiction;
• To take affirmative steps to undo public harm in New York State caused by their deceit and suppression of research concerning health hazards and addictiveness of tobacco, including the funding of a corrective public education campaign, independently controlled and administered, concerning the relationship between tobacco use and disease or nicotine addiction, and the funding of a clinical smoking cessation program including nicotine replacement therapy.
The MSA for New York contains every single public health provision found in the Minnesota settlement. The Zumbro Valley Medical Society of Rochester, Minnesota, is in error to think otherwise. The MSA goes even further. It establishes a $2 billion national public health foundation, a $50 million enforcement fund and elaborate protections from diminution by corporate realignments or other tobacco industry maneuvers. The MSA transcends the Minnesota settlement in many *445 noneconomic respects: It bans use of cartoons in advertising, marketing and packaging; restricts brand name sponsorships; extends billboard restrictions to all outdoor advertising and restricts the size of outdoor signs at retail establishments;[6] bans payments for product placement in television shows, theatrical performances, live theater, recorded performances and video games; prohibits free samples in nonadult facilities; requires proof of age for distribution of free gifts; restricts third-party use of brand names in ways that violate the MSA and requires the tobacco industry members to enforce their trademarks; bans use of nationally recognized brand names or celebrities as names of future tobacco products; establishes a minimum pack size of 20 cigarettes; extracts commitment from the industry to assist in the reduction of youth smoking; dissolves TI and CTR; restricts lobbying against laws that limit nontobacco products that resemble tobacco products; provides for regulation and oversight of new tobacco-related trade associations; establishes a user-friendly, searchable Web-site of all industry-produced documents; and establishes a national foundation to study youth smoking and a counteradvertising fund.
The Special Master has also noted these provisions of the MSA together with others such as the sections that prohibit agreements to suppress research into smoking and health; forbid material misrepresentations on the addictive and harmful effects of tobacco products; prevent youth targeting; ban youth áccess to free samples; and interdict mass transit advertising.
With all of these and the monetary provisions of the MSA, the court is confronted with a settlement that goes well beyond what could have been achieved in plaintiffs’ fondest dreams for the result after a protracted and risky trial, that excels over the Minnesota settlement, and that painstakingly accommodates the public interest. Whether the court itself or amici curiae would have negotiated for other provisions such as a look-back formula, mandatory smoking reduction targets and the funding of a State-wide tobacco control program, the absence of these worthwhile stipulations does not overcome the *446 conclusion that the MSA and STMSA are fair, adequate and reasonable under the circumstances.
The amici have performed an important service in the public interest for which the court, at least, is exceedingly grateful. But for their efforts, in years gone by, through the present, and, hopefully, into the future, they have brought about a culture change that should continue to the good in the 21st century. They are urged to keep up the fight through legislative advocacy, lawsuits and public information campaigns. Their briefs have extracted full and complete explanations from the parties to this litigation impelling them to justify the MSA and STMSA more thoroughly than would have been the case in the absence of the advocacy of the amici curiae. This, however, does not change the fact that the court may not substitute its judgment or add provisions or condition its approval.
Delay Period
Amici, the City of New York, and the Counties of Westchester and Erie want the court to delay decision on approval or rejection of the MSA. They ask for a Special Master to conduct an impartial review and hearing. First, as noted, the court has appointed a Special Master to evaluate the settlement, except for the class action, and to recommend to the court whether or not to approve it. He has done so with thoroughness, professionalism and expedition. Second, prolongation of this process would serve no useful purpose, but it would undermine the very goals set by the MSA and held dear by the amici curiae. Until State-specific finality is realized, New York will receive none of the monetary or substantial nonmonetary benefits of the settlement. Furthermore, delay in the teeth of the case management order in this lawsuit would undermine the efforts in which the parties and the court have engaged since April 1998 to bring this case to a conclusion. A vast block of trial time has been set aside for this case in May 1999. To brook further delay in the event the MSA is rejected in New York would contradict basic tenets of modern case management and would only play into the hands of the defendants in whose interests it would be to postpone the trial as long as possible if the case were not settled. As the joint memorandum of the parties states in response to the amici briefs, “If amici are truly concerned about public health issues, they will not want the youth of the State of New York deprived of the protections of the Consent Decree for three to four ad *447 ditional months.” (Joint mem, at 8-9.) Finally, the voluminous submissions and the thorough report of the Special Master splendidly compensate for the information amici conceive the court would glean by delaying decision for up to 120 days.
Other Concerns of Amici Curiae
The Special Master has addressed the remaining concerns expressed in the briefs of the amici curiae. These involve their misgivings about the scope of the release of claims and the lack of certainty that the settlement proceeds will not be claimed in part by the Federal Government. Suffice it to say that the court has examined these objections and, along with the Special Master, finds that they do not render the settlement less than fair, adequate and reasonable. Indeed, the June 1997 settlement would have released far more than what is being released under the MSA. As to claims of the Federal Government to recoup Medicaid funds, there is no difference between a settlement and a recovery by judgment after trial. For any other of their misgivings, the amici are cordially referred to the report of the Special Master (at 24-30).
Class Action Allocation
The City of New York objects to the allocation of the settlement proceeds among the counties, the City and the State of New York. The City complains that its share inadeqúately recognizes its Medicaid burden and employee medical expenses for tobacco-related illnesses. The City prefers a different formula for allocation that would recognize these expenses more completely. Indeed, the City makes the cheese more binding by referring to the generous compensation the other counties are receiving that recoups their Medicaid expenditures by as much as 145%. The City, on the other hand, says it is getting only 74% reimbursement of its actual health care expenditures.
The affidavit of Todd D. Menenberg, sworn to December 4, 1998, analyzes the City’s objections and explains the methodology by which the allocation was derived. It uses blended data consisting of 60% population and 40% for Medicaid expenditures. The allocation derived from this blend was enhanced for New York City’s share in recognition of the disproportionate contribution of the counties within the City of New York to Medicaid and of the unique claims relating to the New York City Health and Hospitals Corporation and New York City employee health care. The enhancement involved a $1.1 billion transfer from the State’s share to the City’s share.
*448 The affidavit of Donald E. Lochabay, Jr., sworn to December 22, 1998, and the explanation in court by Lucia Valente, Esq., on December 23, 1998, give a full explanation of the methodology by which the Attorney-General arrived at the allocation under current consideration. They demonstrate the extremes to which the technicians went to vindicate the Attorney-General’s fiduciary obligations to each and every member of the class. The complexity of and controversy over the formulas used by the City versus those used by the State to derive the Medicaid figures alone, the variances over time of provisions under Social Services Law § 368-a and the influence of additional calculations other than Medicaid provide eloquent evidence of the wisdom of according the Attorney-General’s allocation a presumption of fairness, reasonableness and adequacy.
The allocation before the court recognizes that the MSA settles not only Medicaid and employee health expense claims derived from smoking-related illness, it accommodates the difficulties in deriving expenditure information for employee health care and unfunded health care expenditures which are not embodied in standard accounting reporting. The current proposal also compares favorably (for the City of New York) to the allocations elsewhere in the country. For example, in Texas the State took 87% of the settlement leaving the remainder for its counties; in California 45% went to the counties and 5% to certain municipalities.
Erie County objects to the original allocation on the ground that it is now being punished for having objected to the second allocation as unfair due to the State’s devotion of its (the State’s) interest in a portion of the Strategic Contribution Fund. Erie also objects this time on the ground that this allocation imposes unfair and arbitrary settlement terms upon similarly situated class members. In a nutshell, Erie objects that it is not being “cut in” on the Strategic Contribution Fund as had been proposed for Erie County and New York City in the second consent decree withdrawn last week.
There is no merit to the objections of Erie County. In its letter dated December 7, 1998, in response to the now resurrected first proposal, it wrote:
“The settlement allocation plan prepared by the Attorney General and presented to you rejects our preferred distribution proposal [based on population alone], resulting in a considerable financial windfall to New York City. Nevertheless, on balance, we believe that the allocation of settlement funds before you represents a fair and reasonable distribution among the *449 counties and New York City in light of the diverse factors that constituted the damages claim in this matter.
“Accordingly, Erie County supports the settlement allocation advanced by the Attorney General, and is hopeful that you will approve this settlement.”
The Strategic Contribution Fund was omitted from any role in the allocation originally submitted to the court. The Attorney-General was even faulted in objections to the now-withdrawn allocation for having failed to articulate that the Strategic Contribution Fund was contingent as to amount, belonged solely to the State, and was not an ingredient in the allocation among the counties. Consequently, in renoticing the original proposal for objections by December 22, 1998, the parties took pains to dispel any notion, not reasonably acquired on the first round, that the Strategic Contribution Fund would play any role in the allocation.
In fact, the plain wording of exhibit U to the MSA makes painfully obvious that the Strategic Contribution Fund would be allocated among the “Settling States” as determined by the Allocation Committee. This allocation, and New York State’s share, will not be known for months after the settlement is approved. Moreover, if Erie County had applied its mathematical skills to the original allocation, it would have realized that no sums from the Strategic Contribution Fund were at play. So, whatever misunderstanding they derived from Lucia Valente, Esq., in the original allocation there was no participation for Erie County in the Strategic Contribution Fund.
In view of the fact that Erie County has already agreed to the very allocation to which it is now registering objection, it has waived its objection. Furthermore, the heart of the objection based on the Strategic Contribution Fund is without merit.
Westchester objects that Erie County and New York City are not part of the class and may not benefit from the proposed settlement. Aside from the suicidal nature of that argument, it was rejected for good and sufficient reasons placed on the record of the hearing of December 18, 1998.[7] It avails Westchester nothing to make this argument again. Westchester was the genesis of my certifying the class to include Erie and New York *450 City. If the objection comes down to the observation that the amended complaint excludes Erie and New York City, this is easily corrected under CPLR 3025 (b) or (c); and, if that be deemed necessary, I hereby deem the amended complaint to be so amended.
Westchester County’s objection to the time afforded by the notice bringing on the resurrected proposal is without merit. It has already had over two weeks to consider the original allocation and much more time to consider the entire MSA and STMS A. To the extent its objection coincides with Erie’s respecting distribution of the Strategic Contribution Fund, it lacks merit from Westchester as much as it lacked merit from Erie.
Furthermore, Westchester, like Erie, has waived any objection to the fairness of the allocation. By letter dated December 7, 1998, it, too, proclaimed:
“The County of Westchester, upon reviewing the Master Settlement Agreement, and after a conference with representatives of the Office of the Attorney General, has determined that although it would have preferred the settlement proceeds of the instant litigation to be divided 50/50 between the State and the member counties, that the allocation of the settlement funds represents a fair and reasonable distribution among the member counties in light of the diverse factors that constituted the damages claim in this matter.
“Consequently, the County agrees with the settlement allocation and is hopeful that your Honor will approve this settlement on December 9, 1998. However, the County reserves its right to opt out should this settlement not be approved in its present form.”
The court notes that Westchester has not opted out.
Finally, Westchester argues that the allocation presents a grossly disproportionate share to New York State of the settlement funds, and that this “most recent reallocation of the settlement funds is clearly a blatant attempt by New York State to appease the Governor and obtain the approval of this Court prior to the end of the year.”
As it has shown the propensity to do before, Westchester County speaks out of both sides of its mouth. The original allocation was fair and reasonable. It remains fair and reasonable. New York State has no occasion to “appease” the *451 Governor. He is, after all, the Chief Executive of this very State of New York. Nothing has changed to prompt Westchester to take such a reckless position as to jeopardize its own citizens by seeking a meaningless delay in the approval of a settlement that is extremely favorable to Westchester, New York City, New York State and every other county of the State of New York including Erie County.
Conclusion
For sure, other terms could have been negotiated in the MSA and STMSA. Likewise, other allocations could have been made between the counties, State and City of New York. But, these observations do not render the settlement, including the class action allocation, less than fair, reasonable and adequate. Especially is this so where the settlement was negotiated by a public official, the Attorney-General of the State of New York, in good faith and at arm’s length. This invests the proposed settlement and proposed allocation with a presumption of validity. The wisdom of the settlement is reinforced by the monumental risks that continued litigation would have presented to the plaintiffs’ claims. If not substantially dismissed at nisi prius, they stood an excellent chance of dismissal on appeal. Amd make no mistake about this litigation, the parties would have invoked every remedy in this court and on appeal that is available.
There is also a value to the public and the immediate litigants to this and any lawsuit, namely, the value of finality. This is no small ingredient in this lawsuit. The MSA and STMSA will head off lengthy and vigorous proceedings in this court followed by years of appellate litigation. By contrast, when State-specific finality is reached under this settlement’s approval, the benefits to the State of New York and its people will begin almost immediately.
The court, therefore, concludes that this settlement should be approved. The consent decree is signed simultaneously herewith.

. By orders dated November 30, 1998, the court granted a motion by John F. Banzhaf III, chief counsel of Action on Smoking and Health, to file a brief amicus on its behalf and a request by Honorable Mark Green for leave to submit a brief amicus on or before December 9. None has been received from the Public Advocate although the views expressed in his letter dated November'25, 1998 have been given serious consideration. By order dated December 1, 1998, the court likewise afforded the Ad-Hoc Coalition on the Proposed Tobacco Settlement (Ad-Hoc Coalition) an opportunity to submit a brief amicus curiae, and its submission has been filed.

. Since the settlement meets the more stringent review of fair, reasonable and adequate, the court need not decide whether the milder CPLR article 78 standard applies here.

. The MSA was reached between the tobacco industry defendants and 46 States as well as the District of Columbia, Puerto Rico, the United States Virgin Islands, American Samoa, the Northern Mariana Islands and Guam. The four remaining States — Florida, Minnesota, Mississippi and Texas— previously reached agreements. As of December 22, 1998, courts in 34 States and Puerto Rico have approved the settlement. None has rejected it.

. “[W]here the time within which an action must be commenced is computed from the time when facts were discovered or from the time when facts could with reasonable diligence have been discovered, or from either of such times, the action must be commenced within two years after such actual or imputed discovery or within the period otherwise provided, computed from the time the cause of action accrued, whichever is longer.”

. Technically speaking, the amended complaint simply asks for a declaration that TI and CTR procured their formation through fraudulent misrepresentation or concealment of material facts and that they exceeded the authority conferred by law and have transacted business in a persistently fraudulent or illegal manner in violation of N-PCL 1101 (a) (2). These declarations would entitle the Attorney-General to their judicial dissolution. He brought separate proceedings for this relief under article 11 of the Not-For-Profit Corporation Law.

. As the Special Master notes, the United States District Court for the Southern District of New York has just struck down the New York City law limiting advertising near schools and playgrounds. (Greater N. Y. Metro. Food Council v Giuliani, US Dist Ct, SD NY, Dec. 15, 1998, 98 Civ 251.) This circumstance not only demonstrates the risks of litigation but also illustrates that the MSA yields more than legislation or judgment would produce.

. The reason New York City and Erie County were omitted from the class described in the amended complaint stemmed from the perception of the Attorney-General that notice by letter pursuant to General Business Law § 342-b sufficed for class members that wanted to opt out. Westchester’s motion corrected that perception. My decision agreed with Westchester that notice of a settlement to all class members would be required anew pursuant to *450 CPLR 907. This is why I said that New York City and Erie owe Westchester a vote of thanks for getting them included in the class.