[763 NYS2d 32]

STATE OF NEW YORK et al., Appellants, v PHILIP MORRIS INCOR-
PORATED et al., Appellants, et al., Defendants, and SULLI-
VAN PAPAIN BLOCK McGRATH & CANNAVO, P.C.,
Intervenors-Appellants.

STATE OF NEW YORK et al., Appellants, v PHILIP MORRIS INCOR-
PORATED et al., Respondents, and SULLIVAN PAPAIN BLOCK
McGRATH & CANNAVO, P.C., et al., Intervenors-Appellants.
JACK S. HOFFINGER, ESQ., et al., Nonparty Respondents.

First Department, July 31, 2003

## APPEARANCES OF COUNSEL

*Sachin S. Pandya* of counsel, New York City (*Michael S. Belohlavek* on the brief; *Eliot Spitzer, Attorney General,* attorney), for plaintiffs-appellants.

*Derek J. Meyer* of counsel, Chicago, Illinois (*Jeffrey E. Stone, Geoffrey A. Vance, Michael A. Pope* and *Elliot Silverman* on the brief; *McDermott, Will & Emery,* attorneys), for defendants-appellants.

*Brian J. Shoot* of counsel, New York City (*Nicholas Papain* on the brief; *Sullivan Papain Block McGrath & Cannavo, P.C.,* attorneys), for Sullivan Papain Block McGrath & Cannavo, P.C., intervenor-appellant.

*Steven L. Levitt* of counsel, Williston Park (*Philip M. Damashek and Dale M. Thuillez* on the brief; *Steven L. Levitt & Associates, P.C.,* attorneys), for Schneider, Kleinick, Weitz & Damashek and another, intervenors-appellants.

*Samuel Issacharoff,* New York City, for Ness, Motley, LLC, Hagens & Berman, P.S., and another, intervenors-appellants.

*Donald N. David* of counsel, New York City (*Bruce N. Lederman* on the brief; *Fischbein Badillo Wagner Harding,* attorneys), for Pamela Anagnos Liapakis, intervenor-appellant.

*Jack S. Hoffinger* and *Harvey Fishbein* of counsel, *New York City* (*Hoffinger, Stern & Ross, LLP,* and *Gould Fishbein Reimer & Gottfried, LLP,* attorneys), for nonparty respondents.

### OPINION OF THE COURT

ANDRIAS, J.

The issue before the Court is whether a Commercial Division Justice has the power to initiate a sua sponte inquiry into an arbitration panel's award of legal fees rendered pursuant to

the provisions of a settlement agreement, where the Consent Decree and Final Judgment settling the matter limited the parties' future applications to the court to those necessary or appropriate to implement or enforce the Consent Decree, and prohibited any modifications unless a party demonstrated it would "suffer irreparable harm from new and unforeseen conditions."

In January 1997, plaintiffs, the State of New York and the Attorney General of the State of New York, commenced this action against several tobacco companies and related entities, seeking to recover the costs that the State and its local governments had incurred in treating smoking-related illnesses. In March 1997, the Attorney General issued a request for proposals for private counsel to represent the State; only 11 law firms responded. Thereafter, in September 1997, six private law firms (hereinafter Outside Counsel) and the State entered into a formal written retainer agreement.

The agreement provided, inter alia, that Outside Counsel would advance all litigation expenses and would be paid legal fees only if the State recovered money in a global settlement agreement that provided for a fund for legal fees or a "compensation vehicle" created for that specific purpose. Alternatively, if the global settlement failed and the State executed a separate settlement agreement with the tobacco defendants, the legal fees would be paid pursuant to various percentage formulas, which fees, in any event, would not exceed four percent of the amount the State actually collected under such settlement agreement or, on a sliding scale, from eight percent down to three percent of any net recovery over $500 million achieved in litigation.

Thereafter, in November 1997, plaintiffs filed an amended complaint which, for the first time, included a sixth cause of action on behalf of the State's counties under General Business Law § 342-b.

In September 1998, Westchester County moved for sundry class-action related relief, fearing that the State's interests diverged from that of the counties insofar as the allocation of any settlement monies from defendants was concerned. On November 12, 1998, Justice Stephen Crane, then of the Commercial Division of Supreme Court, New York County, before whom this action was pending, granted the motion *only* "to the extent of declaring that CPLR Article 9 governs the sixth cause of action of the amended complaint and that this class action will not be dismissed, discontinued, or compromised without

the approval of the Court and notice to any county class members as is required by CPLR 908."

On November 23, 1998, various tobacco companies and states, including defendants and the State of New York, entered into a Master Settlement Agreement (hereinafter MSA), under which certain of the tobacco industry defendants would pay damages in perpetuity. Under the MSA, New York is to receive approximately $25 billion during the first 25 years of the agreement. As a result of the injunctive antismoking measures of the MSA, it is projected that approximately 90,000 lives will be saved in New York alone.

As is relevant to this appeal, subsection (d) of section XVII of the MSA provided that the defendants agreed to "pay reasonable attorneys' fees to the private outside counsel * * * retained by [each] Settling State * * * in accordance with * * * the Model Fee Payment Agreement attached as Exhibit O." The MSA and the Model Fee Payment Agreement (hereinafter Fee Payment Agreement) provided that the attorneys' fees were to be separate and apart from the payments that the tobacco companies would be making to the states and the amount of any attorneys' legal fee award would not increase or decrease the amount that the State would receive.

Under the Fee Payment Agreement, defendant tobacco companies and Outside Counsel could attempt to agree on a fee. If they were unable to do so, the amount of the fee was to be arbitrated by a three-person arbitration panel. One member was to be selected by Outside Counsel and one member was to be selected by the settling tobacco companies. The third "neutral" member was to be the arbitrator who had been previously selected by the tobacco companies and certain previously settling states in their fee arbitration proceedings.

Section 14 of the Fee Payment Agreement provided that the "members of the Panel will consider all relevant information submitted to them in reaching a decision as to a Fee Award that fairly provides for full reasonable compensation of New York Outside Counsel." It also stated that "[t]he Panel shall not be limited to an hourly-rate or lodestar analysis in determining the amount of the Fee Award." Finally, it provided the panel's decision "shall be final, binding and non-appealable."

Pursuant to Justice Crane's order of November 12, 1998, notice of the MSA was given to the counties. The counties (i.e., the members of the class) received the entire MSA, including exhibit O to the Fee Payment Agreement. After holding hear-

ings at which no one objected to the fee payment provisions of the MSA, Justice Crane approved the MSA, including the Fee Payment Agreement, on December 23, 1998, which approval was unanimously affirmed by this Court (*State of New York v Philip Morris, Inc.*, 179 Misc 2d 435, 451 [1998], *affd* 263 AD2d 400 [1999].)

Under the Consent Decree and Final Judgment entered December 23, 1998, the Commercial Division retained jurisdiction only for certain limited purposes. The Consent Decree provides that *"[t]he State of New York and/or any Participating Manufacturer* may apply to the Court * * * for further orders and directions as may be necessary or appropriate for the *implementation* and *enforcement* of this Consent Decree and Final Judgment"* (emphasis added). It also provides that "this Consent Decree and Final Judgment shall not be modified (by this Court, by any other court or by any other means) unless *the party* seeking modification demonstrates, by clear and convincing evidence, that it will suffer irreparable harm from new and unforeseen conditions" (emphasis added).

On August 20, 1999, four smokers sought to intervene in the action. In his order of August 23, 1999, Justice Crane denied the motion as untimely stating "the case is finally disposed of and is no longer in my inventory of cases"; and "the action really is dead." Again, this Court unanimously affirmed (*State of New York v Philip Morris Inc.*, 269 AD2d 268 [2000]).

Thereafter, in December 2000, defendants and Outside Counsel arbitrated the issue of Outside Counsel's fee, Outside Counsel having previously released the State from its obligations under their retainer agreement. Outside Counsel asked the arbitrators to award a fee of five to seven percent of New York State's $25 billion recovery, or $1.25 billion to $1.75 billion. Although, according to the terms of the Fee Payment Agreement, the arbitration was intended to remain private, on April 24, 2001, the New York Law Journal (at 1, col 5) reported that the arbitrators had awarded Outside Counsel a fee of $625 million.

When Justice Crane was elevated to the Appellate Division, in March 2001, the matter was reassigned to Justice Charles Ramos.

Subsequently, in early March 2002, after having learned of the arbitration award, Justice Ramos directed the State to deliver to him copies of its retainer agreement with Outside Counsel and, thereafter, ordered the parties and Outside Counsel to appear for a conference on April 8, 2002. This was

the first time that Outside Counsel had appeared before Justice Ramos and the first time the parties had appeared in court in this action since October 1999, when Justice Crane stated that the case had finally been disposed of.

Justice Ramos told the assemblage that he "had an 'ethical obligation' to inquire whether the $625 million fee had been a product of 'collusion' between the attorneys and the tobacco companies, and, if so, whether some portion of that money should be 'returned' to the State."

Plaintiffs, defendants and Outside Counsel all submitted papers objecting to the court's sua sponte proceeding. Nevertheless, on June 17, 2002, the court ordered all interested parties to show cause why an order should not issue:

> "1) pursuant to CPLR 7511 setting aside the award of the arbitrators dated October 2001[*] on the ground that the majority of the arbitrators manifestly disregarded well established ethical and public policies and/or exceed[ed] their authority under the [MSA] when they granted counsel fees in the sum of $625,000,000, and referring the issue of reasonable compensation to a new panel of arbitrators; and/or

> "2) referring the issues of the amount of the award of legal fees to the Departmental Committee on Discipline; and/or

> "3) conducting a hearing to consider all aspects of the [MSA] and its negotiations as may relate to the retention of counsel and the abandonment of the prior written retainer with the State of New York; and/or

> "4) requiring outside counsel for the State of New York to produce time sheets for the legal services rendered to the State of New York pursuant to their retention as counsel in the above captioned matter and awarding legal fees to counsel in a reasonable amount; and/or

> "5) vacating and setting aside this Court's prior approval of the [MSA] dated December 23, 1998."

Plaintiffs, defendants and Outside Counsel all submitted papers in opposition to the court's sua sponte order.

---

* While the amount of the award was reported in the Law Journal in April 2001, the arbitrators' opinions were not issued until October 2001.

In his order entered October 22, 2002, Justice Ramos stated that the $625 million fee awarded by the arbitrators was "unprecedented." Drawing upon the opinion of the dissenting arbitration panel member, the court declared that the fee worked out to $13,000 per hour without regard to the experience or skill of the attorney involved. It further held that "Outside Counsel's failure to submit an application to fix their fee is a violation of CPLR Article 9 [class actions]."

The court held that the arbitration "was the equivalent of an agreement which requires court approval" and stated that the parties could not, by agreement, "extinguish the court's jurisdiction to hold * * * a [fairness] hearing [under CPLR article 9] to fix their fee." It also stated: "This Court is not bound by the determination of the arbitrators because arbitration was simply one step in the fixing of the fee under CPLR Article 9."

Justice Ramos concluded that "Justice Crane's approval of the process of arbitration in the MSA [did not end] the Court's responsibility under CPLR Article 9. * * * The Court cannot shift its responsibility for supervising legal fees in class actions to an arbitrator."

The court made clear that its review was "based upon the class action status of this case, not on the excessiveness of the fee." Justice Ramos also relied on the courts' inherent power to supervise attorneys, the MSA and the related Escrow Agreement, the Code of Professional Responsibility, and the Code of Judicial Conduct.

Acknowledging that "[a] court's exercise of its authority *sua sponte* is restricted to the most extraordinary circumstances," Justice Ramos found that "payment of attorneys' fees in the amount of $625 million in a class action on this Court's docket without approval of this Court is extraordinary."

In portions of its October 22, 2002 order that are not challenged on appeal, the court withdrew those parts of its order to show cause which sought to vacate the MSA and to vacate the arbitrators' award under CPLR article 75. However, the court held that, if a conflict existed between CPLR articles 9 and 75, the former would trump the latter, for two reasons: "First, this was a class action under CPLR Article 9 before the parties agreed to go to arbitration. Second, a contrary result would render part of Tobacco's penalty determined by a private entity, the arbitrators. New York has a strong public policy against the imposition of private penalties."

Foreshadowing its January 17, 2003 order, the court stated that "someone must set forth the arguments in opposition to

payment of the $625 million." The court expected the Attorney General, "as the representative of the People of the State of New York," to do so, because "the $625 million is part of the settlement of the action" and that "any refund or reduction may revert to plaintiffs, the People of the State of New York or the governmental units representing the people." If the Attorney General did not take on this role, it continued, "this Court will apply its rule in class actions when the issue becomes attorneys' fees and the interests of counsel and settling plaintiffs become[ ] adversarial. Rules of the Justices of the Commercial Division, Supreme Court, New York County, Appendix C, p. 6."

All parties to the MSA as well as Outside Counsel appealed from that order and, in a subsequent order entered January 17, 2003, Justice Ramos appointed "independent counsel" for the plaintiff class members because he "conclude[d] that adversarial interests exist between prior class counsel and the members of the plaintiff class with regard to the issue relating to prior counsels' legal fee and that the interests of the plaintiff-class are not presently represented." The court also stated: "The Attorney Generals' [sic] office has advised this Court that at this point it is not seeking a return of all or part of the $625 million fee and has filed an appeal of this Court's decision and order. In addition, none of the class members has sought to appear and qualify to represent the class." Defendants consented to Outside Counsel's motion to stay the October 22, 2002 order pending appeal and, on February 20, 2003, this Court lifted the stay only to the extent of permitting the lawyers appointed by Justice Ramos to file briefs in these appeals from his orders.

While appellants raise a host of reasons why the October 22, 2002 order should be reversed, the order is defended on only two grounds: CPLR article 9, which governs class actions, and the courts' inherent authority to supervise the conduct of attorneys who appear before them.

Nonparty respondents, the "independent counsel" appointed by Justice Ramos to represent the plaintiff class members, argue that "Article 9 provide[s] the court with broad power over class actions, without qualification, *so long as they remain on its docket.*" (Emphasis added.) However, at the time Justice Ramos initiated his sua sponte proceeding—more than three years after Justice Crane issued the December 23, 1998 Consent Decree and Final Judgment—there was no class action pending before him. Rather, the Commercial Division retained jurisdiction over this action only to the extent provided

for in the Consent Decree and Final Judgment, viz., "The State of New York and/or any Participating Manufacturer may apply to the Court at any time for further orders and directions as may be necessary or appropriate for the implementation and enforcement of this Consent Decree and Final Judgment."

Thus, for example, when the State believed that one of the defendants was violating certain advertising restrictions contained in the MSA, Justice Ramos's exercise of jurisdiction was appropriate because that involved an enforcement application by a *party* as contemplated in the Consent Decree to enforce the MSA (*see State of New York v R.J. Reynolds Tobacco Co.*, 304 AD2d 379 [2003]). However, Justice Ramos had no authority or jurisdiction sua sponte to make an independent inquiry into the amount of or method used in fixing the attorneys' fees. Such an inquiry does not seek to implement or enforce the MSA; on the contrary, such intervention directly contradicts section XVII of the MSA's limited grant of continuing jurisdiction to implement and enforce such agreement, and violates the Consent Decree and Final Judgment's limitation on modifications:

> "the Agreement, this Consent Decree and Final Judgment shall not be modified (by this Court, by any other court or by any other means) unless the party seeking modification demonstrates, by clear and convincing evidence, that it will suffer irreparable harm from new and unforeseen conditions."

As for Justice Ramos's reliance upon the Escrow Agreement for his authority, that agreement has nothing to do with attorneys' fees. Section XVII of the MSA (Recovery of Costs and Attorneys' Fees) was specifically carved out of the MSA by section IX which provided that "[a]ll payments made pursuant to this Agreement (*except those payments made pursuant to section XVII*) shall be made into escrow pursuant to the Escrow Agreement" (emphasis added).

Even if the Commercial Division had jurisdiction to inquire into attorneys' fees, it was bound by Justice Crane's prior approval of the MSA. As previously noted, Justice Crane approved the *entire* MSA, including section XVII and exhibit O (the Fee Payment Agreement), the provision as to how attorneys' fees would be awarded. As Justice Crane acknowledged at the time, the court did not have the power to change the terms of the settlement; rather, it could accept the settlement in toto or reject it in toto (*see* 179 Misc 2d at 439-440; *see also Evans v Jeff D.*, 475 US 717, 726-727 [1986]).

Because Justice Crane's approval of the MSA was subsequently affirmed by this Court, Justice Ramos lacked the subject matter jurisdiction or the power to, in effect, reverse this Court by modifying the MSA (*see e.g. Matter of Branciforte v Spanish Naturopath Socy.*, 217 AD2d 619, 620 [1995]; *Maracina v Schirrmeister*, 152 AD2d 502, 502-503 [1989]).

Independent counsel claim that, at the time he approved the MSA, "Justice Crane could not anticipate what ultimately occurred at the arbitration where (a) the People were not represented; (b) all State counsel (including the Attorney General) testified only for the lawyers; (c) Tobacco put in no defense to speak of; and (d) the proceedings, with unsworn testimony, were shielded from public scrutiny and resulted in fees amounting to $13,000.00 an hour per attorney across the board!" Such arguments are without merit.

First, as previously noted, the Fee Payment Agreement made clear that the arbitration would be between the tobacco defendants and Outside Counsel. The MSA envisioned that the "People" (i.e., the State of New York) would not be represented at the arbitration because any fee award would come solely out of defendant tobacco companies' pockets and would not affect the State's recovery in any fashion.

The whole concept of "collusion" raised by both Justice Ramos and his appointed counsel makes no sense in the context of this litigation. If the tobacco defendants had wanted to "collude" in paying too high a legal fee, pursuant to the Fee Payment Agreement they could have reached an agreement with Outside Counsel without going through the time, expense and uncertainty of arbitration. There would also have been no need for their nominated arbitrator to write a dissent.

Finally in this regard, it is inaccurate to say that "Tobacco put in no defense to speak of." The tobacco defendants—who had every incentive to reduce the amount of attorneys' fees that they would have to pay—told Justice Ramos that they "vigorously contested New York Outside Counsel's positions throughout the four-day arbitration" and that "[t]he parties * * * participated in a hotly-contested adversarial arbitration." Outside Counsel noted that "[t]he Industry, which * * * vigorously contended that Counsel should be awarded far less than they sought, submitted materials in support of its opposing views and arguments."

Moreover, even if, for argument's sake, Justice Ramos had jurisdiction to reconsider its merits, Justice Crane's approval of the settlement which provided for binding arbitration of attorneys' fees was proper.

Justice Ramos's October 22 order rests on the assumption that, if CPLR articles 9 and 75 conflict, the former trumps the latter. However, that assumption is incorrect. In *Harris v Shearson Hayden Stone* (82 AD2d 87, 94 [1981], *affd* 56 NY2d 627 [1982]), this Court held that "the interests favoring arbitration should prevail over those favoring the class action, both in general and in the present instance."

When Justice Crane approved the MSA, he approved an agreement which provided for final, binding arbitration of attorneys' fees. There is no authority to disturb that decision, which was subsequently affirmed by this Court. In addition to the strong public policy in favor of arbitration (*see e.g. Matter of New York City Tr. Auth. v Transport Workers Union of Am.*, 99 NY2d 1, 6 [2002]) and the fact that it is both common and perfectly permissible to arbitrate attorneys' fees, there are factors specific to this case which militate against Justice Ramos's order.

First, even if CPLR 909 were meant to protect class members from "greedy" attorneys, the class in this case consists of the State of New York and the counties of New York, each member of which is represented by its own attorney. Such sophisticated class members hardly need the protection of a court scrutinizing a fee award for fairness (*compare Lincoln Plaza Assoc. v Various Tenants*, 134 Misc 2d 791, 793 [1987] [where Justice Ramos tried to protect "a relative[ly] unsophisticated group of tenants"], *mod sub nom. Lincoln Plaza Assoc. v Andrews*, 142 Misc 2d 207 [1989]).

In a related vein, the class members had a chance to read the MSA and make objections before Justice Crane approved it. (*See* CPLR 907 [2]; 908.) No one, however, objected to the attorneys' fee provision of the MSA. That is not surprising because the tobacco defendants were going to pay the fees, and the fee payment would have no effect on the class members' recovery.

Finally, only one cause of action out of 16 was provisionally certified as a class action (179 Misc 2d at 437, 442), and it was certified because of a potential conflict between the State of New York and the other members of the class (the counties) over the allocation of settlement proceeds among themselves. This hardly constitutes grounds to challenge the *entire* fee award, especially when the fee has nothing to do with the reason why the class was originally certified.

As to Justice Ramos's claim to inherent authority over attorneys, his decision is internally inconsistent. On the one

hand, he states: "The Court's review here is based upon the class action status of this case, *not on the excessiveness of the fee*" (emphasis added). On the other hand, he also states that he has inherent power to inquire into the reasonableness of the fee. However, there would be no need for the court to inquire into the fee unless it thought the fee was unreasonable, i.e., excessive.

There is a difference between the power of courts in general and an individual judge's power to conduct the legal fee inquiry at issue here. Thus, courts have inherent authority to promulgate rules of general applicability regarding lawyers' fees (*Matter of First Natl. Bank of E. Islip v Brower*, 42 NY2d 471 [1977]; *Gair v Peck*, 6 NY2d 97 [1959], *cert denied* 361 US 374 [1960]), to respond to a complaint from bar associations that "ambulance chasing" was spreading to a demoralizing extent (*People ex rel. Karlin v Culkin*, 248 NY 465 [1928]), and to set legal fees in connection with the settlement of an estate (*Matter of Stortecky v Mazzone*, 85 NY2d 518 [1995]; *Matter of Lafferty*, 297 AD2d 469 [2002]). However, neither Justice Ramos nor independent counsel has cited any authority for the proposition that a court has inherent authority to hale before it lawyers who last appeared before a different judge of coordinate jurisdiction some 2½ years earlier, to start a sua sponte inquiry into the appropriate amount of attorneys' fees when no fee application was pending before it, or to review an arbitral award when no party has moved to modify or vacate such award.

The cases relied upon by Justice Ramos merely hold that a court has "control over attorneys *appearing before it*" (*Chang v Chang*, 190 AD2d 311, 319 [1993] [emphasis added]) and that a judge "may regulate *the conduct of attorneys in his courtroom*" (*Matter of De Perno v Garramone*, 120 Misc 2d 881, 882 [1983] [emphasis added]). However, the April 2002 conference called by Justice Ramos was the first time that Outside Counsel had appeared before him. The last time they had appeared before the Commercial Division on this matter was in August 1999 before Justice Crane. As of April 2002, Outside Counsel no longer represented the State of New York; their contract had expired in September 2001. None of the conduct for which Outside Counsel is apparently being criticized (seeking large fees before an arbitration panel) occurred in Justice Ramos's courtroom.

Similarly, the cases cited for the courts' inherent authority over fees envision two situations: (i) an attorney asking the

court to approve a fee, or (ii) a client complaining about a fee, neither of which occurred here.

At bottom, this proceeding appears to have started because Justice Ramos found the arbitrators' award of a $625 million fee to be "offensive." However, the adequacy of an arbitral award is not grounds for review (*see e.g. Matter of Torano [Motor Veh. Acc. Indem. Corp.]*, 19 AD2d 356 [1963], *affd* 15 NY2d 882 [1965]). Indeed, in *Torano*, the Court of Appeals upheld an arbitral award even though the dissent stated, "There surely must be a point at which an award by an arbitrator is so shockingly disproportionate as to require judicial intervention" (15 NY2d at 886 [Bergan, J., dissenting]).

In general, the grounds set forth in CPLR 7511 "are the exclusive bases for vacatur of an arbitral award" (*Matter of New York State Nurses Assn. [Nyack Hosp.]*, 258 AD2d 303, 303 [1999], *lv denied* 93 NY2d 810 [1999]; *see also Torano*, 19 AD2d at 358). Although a standard more akin to a CPLR article 78 proceeding is used when fee arbitration is required by a disciplinary rule (*Matter of McNamee, Lochner, Titus & Williams [Killeen]*, 267 AD2d 919, 920 [1999]), the fee arbitration in the instant case was consensual, not compulsory.

Even if Justice Ramos had the power, which he did not, to reduce Outside Counsel's fees, he had no authority to order the tobacco defendants to make payments to the State instead of Outside Counsel. The New York Fee Payment Agreement clearly provides that it is between those defendants and Outside Counsel and that there are no third-party beneficiaries except in instances not relevant to the current proceeding. Moreover, the Consent Decree and Final Judgment states: "Each party shall bear its own costs, except as may be provided in the MSA * * * ."

Finally, just as Justice Ramos lacked the authority to sua sponte reopen the MSA in order to inquire into the setting of Outside Counsel's attorneys' fees, he also lacked the authority to appoint "independent counsel to represent the plaintiffs-class members in this action."

Such appointment was made pursuant to Justice Ramos's own self-adopted rule, rule 36, appendix C (6) of the Rules of the Justices of the Commercial Division, Supreme Court, New York County. Such rule governs the settlement of class actions pending in Justice Ramos's part and provides that "[t]he Court may appoint independent counsel to represent the proposed class members on the question of class certification, fees to be awarded class counsel or any other issue where the Court is

unable to determine the relative strengths of the parties' positions, or if the settlement raises questions about collusion or the ability of plaintiffs' counsel to represent the interests of the class."

However, as previously noted, there was no class action pending before Justice Ramos—the class action was settled before Justice Crane in December 1998, long before Justice Ramos's assignment to the Commercial Division or his adoption of the rule.

Secondly, in his January 2003 order, Justice Ramos concluded that "the interests of the plaintiff-class are not presently represented." However, in an action under General Business Law § 342-b (which is what the class action part of *State v Philip Morris* was), the Attorney General of the State of New York represents the class, as can be seen from the statute itself. The counties who are also class members have stated that they "agree with the position taken by the New York State Attorney General's Office * * * in this action." Therefore, "although an individual possesses no absolute right to representation by an attorney of his choice, any restriction imposed on that right will be carefully scrutinized" (*Matter of Abrams [Anonymous]*, 62 NY2d 183, 196 [1984] [citations omitted]). Justice Ramos should not have foisted "independent counsel" upon the counties, who are able to defend their own interests. The counties clearly do not want the lawyers appointed by Justice Ramos; they have told the nonparty respondents to stop acting on their behalf.

Even if Justice Ramos disagrees with the Attorney General's conduct of this litigation, that is not a reason for appointing independent counsel (*see People v Bunge Corp.*, 25 NY2d 91, 98 [1969] ["in the absence of a clear expression by the Legislature to the contrary * * * the discretion of the Attorney-General in maintaining or discontinuing an action may not be made the subject of inquiry by the courts"]).

There is simply no basis for the court's conclusion that "adversarial interests exist between prior class counsel and the members of the plaintiff class with regard to the issues relating to prior counsels' legal fee and that the interests of the plaintiff-class are not presently represented," or any authority for the type of appointment made in this instance. Thus, our previous order permitting "independent counsel" appointed by Justice Ramos to file a brief in this appeal should not be considered in any way our imprimatur of such appointment.

Finally, while Justice Ramos's concern over excessive legal fees is laudable and appears to have been motivated by a mis-

apprehension that any reduction in legal fees would increase the State's recovery, it should be noted that his concern that the "People of the State of New York" were not appropriately represented at the arbitral table is severely undermined when the legal fee provisions of the original retainer agreement negotiated by the Attorney General are compared to the approximately two percent fee awarded by the arbitrator to Outside Counsel. As previously noted, the original retainer agreement provided for a cap on legal fees of four percent of the amount of any net recovery "actually collected" pursuant to a settlement agreement and, if the case went to litigation, a sliding fee of eight percent down to three percent of any net recovery over $500 million.

Accordingly, the order of the Supreme Court, New York County (Charles Ramos, J.), entered October 22, 2002, which, to the extent appealed from, granted the court's own motion to the extent of staying the payment of legal fees and directing Outside Counsel to submit a proposed notice informing the members of the class, inter alia, that Outside Counsel would be making application for a fee for the settlement of this case in the sum of $625 million, and denied the cross motions of the Attorney General and various representatives of Outside Counsel to, inter alia, vacate the court's June 17, 2002 order to show cause, dismiss the proceeding, and for an order determining that the court had no jurisdiction to take any action regarding the attorneys' fees awarded Outside Counsel in the arbitration proceeding under the MSA, should be reversed, on the law, without costs, the cross motions designated 022, 023, 024, 025, 026, 027, 028, 029 and 031 should be granted, the order should be vacated, and the court's sua sponte proceeding should be dismissed. Order, same court and Justice, entered January 17, 2003, which sua sponte appointed "independent counsel" for the plaintiff class members, should be reversed, on the law, without costs, and the order should be vacated.

NARDELLI, J.P., TOM and LERNER, JJ., concur.

Order, Supreme Court, New York County, entered October 22, 2002, reversed, on the law, without costs, certain cross motions granted, the order vacated, and the court's sua sponte proceeding dismissed. Order, same court, entered January 17, 2003, reversed, on the law, without costs, and the order vacated.